## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**MELISSA KUMAR**

   **Plaintiff,**

**v.**               **Civil Action No. 2:05cv499**

**THE GLIDDEN COMPANY, et al.,**

   **Defendants.**

### OPINION AND ORDER

Plaintiff Melissa Kumar filed a civil action against defendants The Glidden Company, Zeneca, Inc., and Roman Adhesives, Inc. alleging personal injuries caused by the defendants' negligence, failure to warn, breach of express warranty, breach of implied warranty, and negligent misrepresentation with respect to the use of a wallpaper adhesive named Professional Adhesive Pro.  Hereinafter collectively referred to as "defendants," the companies were engaged in the design, manufacture, distribution, production, or testing of the wallpaper adhesive. Defendants filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, claiming that the plaintiff's claims are barred by the Virginia statute of limitations.  In seeking to avoid the application of the statute of limitations, the plaintiff has claimed incapacity.  For the reasons that follow, this Court finds that the plaintiff was not incapacitated and that the statute of limitations has expired.  Therefore, the Court **GRANTS** summary judgment in favor of the defendants.

1

## I.  FACTS AND PROCEDURAL BACKGROUND

From 1986 until January of 2000, plaintiff Melissa Kumar ("Kumar") worked as a

wallpaper installer for Unique Interior Designs, a company which serviced large commercial and

residential projects.  (See Br. in Opp. to Def.'s Mot. for Summ. J. at 2.)  Throughout her

employment, Kumar used adhesives that were manufactured, designed, produced, and/or

distributed by The Glidden Company, Inc., Roman Adhesives, Inc., and Zeneca, Inc.  (Id.)

Plaintiff's sister, Belinda Krimsiek, owned Unique Interior Designs and filed a similar lawsuit

against the defendants in January 2002.[1]  (Mem. in Supp. of Def. Roman's Mot. for Summ. J.,

Ex. E.)  The plaintiff was deposed in that lawsuit on November 14, 2002.  (Id.)

From 1988 through August of 2003, Kumar sought treatment for a bevy of physical and

mental conditions.  (See Br. in Opp. to Def.'s Mot. for Summ. J. at 2.)  Physically, her expert

witness, Dr. Grace Ziem, reports that, starting in 1988, Kumar experienced nasal congestion,

irritation of her throat, loss of her voice, rashes, rapid breathing and the sensation of not getting

enough air when she used the defendants' adhesive.  (Ziem Rep. at 2.)  In 1989, her symptoms

increased to include impaired memory, increased musculoskeletal aching and, in ensuing years,

reproductive abnormalities resulting in three miscarriages.  (Id.)  On August 7, 2003, Dr. Ziem

diagnosed Kumar as suffering from toxic encephalopathy, peripheral neuropathy, reactive airway

disease, widespread toxic-induced neural sensitization and inflammation as a result of repeated

and prolonged exposure to defendants' wallpaper adhesive.  (Id.)  Dr. Ziem reports that the

plaintiff had "frequent neurologic symptoms" which had not been present prior to her exposure

to the defendants' product, including difficulty thinking clearly, getting lost, forgetfulness,

---

[1]That suit, Belinda Lee Loar v. The Glidden Co. et al, 4:02cv5, was filed in the Eastern
District of Virginia, Norfolk Division.

muscle spasms, blurred vision, poor balance, numbness, and tremor.  (Id.)  She also had frequent headaches, weakness, fatigue, impaired coordination, sinus and throat congestion, and genital urinary symptoms of burning without infection.  (Id.)  According to Dr. Ziem, all of these symptoms developed after being exposed to the adhesive in 1988 and persisted during her exposure to the product.  (Id.)

The plaintiff also underwent treatment for a variety of mental health problems.  In 1989 she was diagnosed as suffering from panic disorders.  (See Br. in Opp. to Def.'s Mot. for Summ. J. at 2.)  In 1992 and 1993 she received a psychological diagnosis of bi-polar/manic depression while a patient at Eastern State hospital.  (Id.)  After this diagnosis, she received treatment for her disorder with Colonial Mental Health until 1996.  (Id.)  Kumar was hospitalized as a result of suicide attempts on three occasions between 1994 and 1995.  (Id.)  Her mental health treatment continues to the present day.  (Id.)

In 1996, Kumar's psychiatrist advised her that she was no longer able to work due to her mental state.  (Id. at 3.)  She then applied for disability benefits from the Social Security Administration in August 1996.  (Id.)  On or about January 19, 2000, Kumar allegedly began to experience flu-like symptoms and ceased working.  (Id.)  After this date, she was not able to return to her job as a wallpaper hanger or engage in any other form of employment.  (Id.)

The Social Security Administration awarded disability benefits in August 2002, retroactive to 1999.  (Id.)  Her disability award was based on her diagnosis of being bi-polar with a severe panic disorder and because she had severe degenerative bone, disc, and joint disease and arthritis of the spine.  (Id.)  The plaintiff's mother, Ethel Loar, was designated as payee for Kumar's benefits because the Social Security Administration found that Kumar had problems

with alcohol abuse.  (Id.)

Plaintiff filed a Motion for Judgment in Portsmouth Circuit Court on August 5, 2004. The case was removed to federal court on August 26, 2005 pursuant to Title 28 United States Code Sections 1441 and 1446.  On February 16, 2006 defendants Glidden and Zeneca filed a motion for summary judgment based on the expiration of the two-year statute of limitations for personal injury cases in Virginia.  See Va. Code Ann. § 8.01-243(A).  On February 24, 2006 defendant Roman filed a motion for summary judgment based on the same grounds.[2]

## II.    LEGAL STANDARD

### A.    Summary Judgment

Defendants' motion for summary judgment alleges that Kumar's claims are barred as a matter of law because she failed to file her personal injury lawsuit within Virginia's two-year statute of limitations period.  See Va. Code Ann. § 8.01-243(A).

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted where "the pleadings, depositions [and] answers to interrogatories . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, a court views the facts in the light most favorable to the nonmoving party.  United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).  The moving party has the threshold burden of informing the court of the basis of the motion, of establishing that there is no genuine issue of material fact, and of showing that it is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also

---

[2]After plaintiff responded to the motion for summary judgment, defendants jointly filed a Reply brief.  Therefore, given that each of the two motions only raised the statute of limitations and that the arguments raised are almost exactly the same, the Court will address the two motions as one.

4

Castillo v. Emergency Med. Assoc., 372 F.3d 643, 646 (4th Cir. 2004).

Once the moving party satisfies this threshold showing under Rule 56(c), the burden of production, not persuasion, shifts to the non-moving party. Id. at 322-23. The non-moving party must "go beyond the pleadings and by [his] own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

### B.   Applicable Law.

As a federal court sitting in diversity, the court must apply and interpret the substantive law of the state in which the action arose. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). In this case, the Virginia statute of limitations applies. See Rowland v. Patterson, 852 F.2d 108, 110 (4th Cir.1988); Castillo, 372 F.3d at 646. The Virginia statute of limitations provides that: "every action for personal injuries, whatever the theory of recovery . . . shall be brought within two years after the cause of action accrues." Va. Code Ann. § 8.01-243(A) (Michie 2003). "[T]he right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person . . . ." § 8.01-230. The defendant bears the burden of proving that the statute of limitations has expired. See Rivera v. Nedrich, 259 Va. 1, 6, 529 S.E.2d 310, 312 (1999).

## III.   DISCUSSION

### A.   Statute of Limitations.

The statute of limitations for plaintiff's causes of action has expired.  In Virginia, a plaintiff must bring an action for personal injury within two years after the cause of action accrues.  § 8.01-243(A).  A cause of action accrues "from the time plaintiff was hurt."  See Locke v. Johns-Manville, 221 Va. 951, 958, 275 S.E.2d 900, 905 (1981).  In many cases, the time of injury will arise at a specific point in time when a wrongful act occurs.  See id.  For example, if a plaintiff broke a bone, the statute of limitations would begin to run on the day the bone broke. Id.  In other cases, especially those caused by exposure, the injury does not necessarily occur contemporaneously with the wrongful act, but at a later time when exposure is sufficient to cause an injury.  Id. (describing mesothelioma caused by prolonged exposure to asbestos).  That is, "the accrual point is when the damage occurs."  Id.

It is not necessary that the injury be diagnosed or even linked to the cause in question for the statute of limitations to begin to run.  Id.  It is well settled in Virginia that the limitations period "begins running at the time of the initial injury, not at the time of diagnosis or discovery." Wade v. Danek Med., Inc., 182 F.3d 281, 285 (4th Cir. 1999).  The Virginia Supreme Court has specifically stated that "an injury is deemed to occur, and the statute of limitations period begins to run, whenever any injury, however slight, is caused by the negligent act, even though additional or more severe injury or damage may be subsequently sustained as a result of the negligent act."  St. George v. Pariser, 253 Va. 329, 332, 484 S.E.2d 888, 890 (1997).  Therefore, if the defendants can show when an injury occurred, however slight that injury may have been, the statute of limitations begins to run from the date of the injury.  See id.

In summary judgment, the moving party has the burden of establishing the absence of a genuine issue of material fact.  See Celotex, 477 U.S. at 322.  Based on the plaintiff's own

statements in interrogatories and pleadings as well as her own medical expert's report, it is clear

that the injury arose well before the two-year limitations period had run.  Plaintiff filed this

lawsuit on August 5, 2004.  Therefore, the injury must have arisen on or after August 5, 2002 in

order to survive defendant's motion for summary judgment based on the statute of limitations.

In her Motion for Judgment, plaintiff states that "prior to, during and subsequent to

January 19, 2000, and continuing to the present day, plaintiff has suffered and does suffer from a

multitude of physical and mental symptoms, for which she has sought continuous treatment and

diagnosis from various health care providers."  (Motion for Judgment ¶ 6.)  Moreover, in

plaintiff's response to Interrogatory Nine,[3] she states that she "has suffered a permanent injury

and/or disability as a result of the exposure to Defendant's products. [She] was caused to stop

working on a full-time basis commencing August 1996 due to her symptoms/injuries."

(Plaintiff's Resp. to Interrog. No. 9.)

The plaintiff's own medical expert details a wide range of symptoms beginning with the

her first exposure to the wallpaper adhesive in 1988.  (Ziem Rep. at 2.)  Specifically, she

describes "ever-increasing symptoms, which included nasal congestion, irritation of her throat,

losing her voice, rashes, rapid breathing and a sensation of not getting enough air."  (Id.)  In

1989, Dr. Ziem reports that her "symptoms gradually increased to involve impaired memory,

increased musculoskeletal aching in addition to the above mentioned symptoms."  (Id.)

Although the plaintiff may not have realized the cause of her "ever-increasing symptoms"

until she saw Dr. Ziem in 2003 (see id.), the statute of limitations begins to run when the initial

---

[3]The interrogatory asked "[i]f you claim you suffer from a permanent injury or permanent disability as a result of the alleged exposures that for the basis of this lawsuit, state the nature of the injury or disability."  Defendant's Inter. No. 9.

injury occurs, not when the cause or problem is diagnosed, see Wade, 182 F.3d at 285.  From the

plaintiff's own statements and those of her expert witness, there can be no doubt that the injury

arose more than two years prior to August 5, 2004—the date the plaintiff first filed suit.  The

plaintiff began to suffer adverse consequences from exposure almost immediately after coming in

contact with the defendant's adhesive in 1988.  (Id.)  The plaintiff informed Dr. Ziem that her

symptoms would begin within an hour of working with the adhesive and would subside on days

where she did not come in contact with it.  (Id.)  She also reported that symptoms subsided after

she showered and washed the adhesive off of her skin.  (Id.)  Finally, Dr. Ziem stated that her

opinions were "rendered within a reasonable degree of medical certainty."  Id. at 13.

Although the nature of the harms allegedly created by exposure to the defendants'

adhesive prevents the Court from determining the exact date the injury first occurred, like it

would be able to had the plaintiff broken a bone or fallen from a ladder, it is clear that the injury

the plaintiff complains of occurred in 1988.  As such, plaintiff's claims are barred by Virginia's

statute of limitations.

### B.    Tolling the Statute Because of Incapacity.

The plaintiff claims that the statute of limitations should be tolled because she was

mentally incapacitated.  In support of her argument, she cites her mental health issues, her

alcoholism, the Social Security Administration's requirement that she name a payee for her

benefits, and her dependence on her mother for help and care.  "If a person entitled to bring such

action becomes incapacitated, the time during which he is incapacitated shall not be computed as

any part of the period within which the action must be brought."  § 8.01-229(A)(2)(b).  "[A]

person shall be deemed incapacitated if he is so adjudged by a court of competent jurisdiction, or

if it shall otherwise appear to the court or jury determining the issue that such person is or was incapacitated within the prescribed limitation period." Id. The burden of proving incapacity is on the plaintiff. See Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp., 546 F.2d 570, 574 (4th Cir. 1976); Drazan v. United States, 762 F.2d 56, 60 (7th Cir. 1985); Wollman v. Gross, 637 F.2d 544, 549 (8th Cir. 1980).

Although Section 229 does not define incapacity, other provisions of the Virginia Code are instructive. See Hughley v. Basham, 2003 WL 24101521, *3 (E.D. Va. 2003). In a provision guiding the appointment of guardians and conservators, an "incapacitated person" is defined as:

> "an adult who has been found by a court to be incapable of receiving and evaluating information effectively or responding to people, events, or environments to such an extent that the individual lacks the capacity to (i) meet the essential requirements for his health, care, safety, or therapeutic needs without the assistance or protection of a guardian or (ii) manage property or financial affairs or provide for his or her support . . . without the assistance or protection of a conservator."

§ 37.2-1000.

Plaintiff asserts that she was incapacitated from the mental injuries caused by exposure to the adhesives, from her battle with alcoholism, and from other mental health problems. She asserts four reasons why she the statute should be tolled for incapacity. First, she asserts that she received treatment from 1989 through 2003 for mental illness. Second, she asserts that she was incapacitated by virtue of being an alcoholic. Third, she asserts that the Social Security Administration required her to name a payee to manage her benefits in 2002 because her problems with alcoholism made her incapable of managing her benefits. And finally, she asserts that her dependence on her mother for help running errands, cleaning, and transportation shows that she was incapacitated.

9

On April 4, 2006 this Court held a hearing on summary judgment.  During the hearing, the plaintiff was questioned at length by her attorney, the defendants, and by the Court.  Throughout her testimony it was quite obvious that, despite some difficulties with her mental and physical health, the plaintiff has been a successful employee, a contributing member of society, and a caring and dedicated mother.  Her perseverance in the face of some difficult obstacles is notable, and to understand her ability—her *capacity*—to overcome those obstacles, it is essential to describe both the difficulties that she has faced and the evidence showing that she was not incapacitated for the purposes of tolling the statute.

       1.      **Facts supporting her capacity.**

About sixteen years passed between the date her first symptoms arose in 1988 and the date that she filed her lawsuit in 2004.   For most of this time, the plaintiff led the life of a very hard-working single mother.  The plaintiff has an extensive employment history and was clearly not afraid of hard work.  From 1986-1994, she worked full-time at Colonial Williamsburg as a waitress.  (Tr. of S.J. Hr'g, Apr. 4, 2006, at 70).  During this time she also held various second jobs including helping her sister hang wallpaper.  (Id. at 13.)  In fact, it was not uncommon for the plaintiff to work seventy hours per week.  (Id. at 14.)  She went to school to become a Clinical Nurse's Assistant, passed a state board exam, and worked in a number of nursing facilities.  (Id. at 50.)

Although her home and family life was filled with problems, there are also some key successes that show her ability to overcome these obstacles.  She was a victim of an abusive husband in the mid-1980s and then got divorced from him.  (Id. at 75.)  Her two children went to live with her husband at that time.  (Id.)  She remarried in 1994 and her husband

disappeared shortly thereafter.  (Id. at 61.)  Despite these problems, it is notable that she purchased her own house in December 2002.  (Id. at 62.)  In 1995, she gave birth to a third child, Forrest, whom she raised largely by herself.  (Id.)  She also appears to have an excellent relationship with her mother, Ethel Loar, who testified during the hearing and who takes care of her finances in accordance with the Social Security Administration's requirements.  Her brother lives with her on occasion and helps her with household duties and she appears to have good relations with her other siblings and relatives.

Throughout her testimony, Kumar provided numerous examples of her ability to care for herself, look after her own affairs, and care for her child.  For example, she testified to keeping track of her son's medical appointments in a calendar (id. at 69), she communicates with her son's teachers at school and they contact her with concerns about him (id. at 68).  She receives a check from the state Temporary Aid for Dependent Children program in her own name.  (Id. at 72.)  Although Social Security payments must be filtered through her mother, she is very knowledgeable about her finances.  She knows how much money she gets from Social Security, how much money she gets for her son from Social Security, and the amount of money she gets from the state.  (Id. at 74.)  She has a mortgage on the home she purchased and knows how much she pays for her monthly mortgage payment.  (Id.)

She does depend on her mother to a certain degree.  The plaintiff does not have a car or a driver's license and her mother provides her with transportation.  (Id. at 38.)  Her mother also testified that she helps the plaintiff with household chores, though this appeared to be largely because of her physical impairments and not because of any mental incapacity.  (Id. at 36.)  The plaintiff has degenerative bone disease and suffers from bad knees and a bad back.

11

(<u>Id.</u> at 6.)  Her mother stated that the plaintiff can do light work, just not heavy things.  (<u>Id.</u> at 37.)  She does not go to her daughter's home daily, but does go often.  (<u>Id.</u>)

Finally, the Court cannot help but consider the fact that the plaintiff was deposed in a similar action brought by her sister, Belinda Lee Loar, in November 2002.  (Mem. in Supp. of Def. Roman's Mot. for Summ. J., Ex. E.)  Not only does this tend to show her capacity as a witness, but it shows that she had close contact with and access to her sister's lawyer.  (<u>See</u> <u>id.</u>)  Moreover, her deposition reflects her knowledge of her sister's problems with the adhesive as early as January 2000 and the fact that her sister was seeing Dr. Ziem. (<u>Id.</u> at 46.)  The plaintiff also testified that her sister had provided her with a wealth of research regarding the effect that the defendants' adhesives may have had.  (<u>Id.</u> at 64-65.)  In conclusion, the plaintiff had knowledge about the alleged effects of the product, she had knowledge of her sister's health, she was able to testify as to the use of the product, her sister's condition, and any alleged connections between them, and she had ample opportunity to approach a lawyer who was already intimately involved with a case regarding the same subject matter.

## 2.  Facts in support of her incapacity.

In support of her claim that she was incapacitated, the plaintiff relies largely on four factors.  First, she assert her history of mental health problems.  Plaintiff was hospitalized on four occasions.  She was briefly hospitalized once in 1992, for three days in 1994, once for about three weeks in 1995, and once for about a week and a half in 1995.  (Kumar Depo. at 129.)  These hospitalizations resulted from suicide attempts and depression.  (<u>Id.</u>)

Second, the plaintiff stated that she is an alcoholic.  (<u>Id.</u> at 79.)  She joined Alcoholics Anonymous in 1993 or 1994 and has had the same sponsor ever since.  <u>Id.</u>  The plaintiff

admittedly drank on occasion and stated that it was a constant struggle to stay sober.  Id. at

81.  However, she said "I relapse but I jump right back on the wagon."  Id.  This statement, in

combination with her ability to have a job and raise her children during the same period,

shows that although she had a problem, she did have control over her life.   Her alcoholism

has not prevented her from taking care of herself and her son.

       Third, the plaintiff argues that the Social Security Administration's decision to require

a payee, which is her mother, to receive and manage her disability benefits shows that she

was incapacitated by virtue of her substance abuse problems.  The purpose of requiring those

with substance abuse problems to name a payee for disability benefits is to "serve the interest

of the individual because the individual also has an alcoholism or drug addiction condition

(as determined by the Commissioner) and the individual is incapable of managing such

benefits." Contract with America Advancement Act of 1996, Pub. L. No. 104-121, 110 Stat.

847.

       Finally, the plaintiff called her mother to testify regarding the amount of help she

provides aside from controlling her finances as per the requirements of the Social Security

Administration.  As discussed above, her mother testified that she visited the plaintiff often,

though not every day, and helped her with chores that she could not perform because of her

physical limitations.  (Id. at 36.)  She also testified that she was the plaintiff's only means of

transportation to take her and her son to appointments or to take her on errands.  (Id. at 38.)

### 3.   Analysis of plaintiff's capacity.

       Viewing the evidence in the light most favorable to the non-moving party, it cannot

be said that the plaintiff was incapacitated within the meaning of the statute.  First, her

hospitalizations, even if they are considered periods of incapacity, were very brief.  At most, they would only toll the statute of limitations for a few months time.  As the plaintiff's injuries first arose in 1988, this would obviously not toll the limitations period for the approximately fourteen-year period.  Second, her alcoholism is, by every indication, under control.  She stated that she really stopped drinking in 1996.  (Id. at 49.)  She did admit to having relapses, but she contacts her sponsor and states that she is able to become sober quickly.  (See id. at 79.)

Third, she has not been declared incapacitated by any court of competent jurisdiction. Although the Social Security Administration required her to appoint a payee for her disability benefits, that appointment was made in light of the fact that the plaintiff "suffers from a drug addiction/alcoholism condition."  Pl. Brief in Opp. to Def. Motion for S.J., Exhibit A, at 4. While the Commissioner of Social Security's determination that her substance abuse problems impede her ability to manage her benefits, those problems have little to do with her ability to contact a lawyer, understand her legal rights, or file a lawsuit.  For example, in Sisk v. Virginia, the Court found that a plaintiff who was seeking to toll a statute of limitations in part because of a crippled hand was able to use the telephone.  See 50 Va. Cir. 230 (2001). The Court stated that her ability to make a telephone call "evidences that she could just as easily called a lawyer or filed suit."  Id.  In the same vein, the plaintiff's inability to manage her funds because of a past alcohol problem did not prevent her from applying for disability in the first place, did not prevent her from entering into a marriage, having a child, buying a home under her name, and undertaking numerous other important obligations.  If she could undertake these activities, she certainly could have called a lawyer.

14

Finally, through her mother's testimony, it is clear that although she manages the plaintiff's finances, as required by the Social Security Administration, the plaintiff is not completely dependent on her mother for other care.  She does have some physical limitations that may make occasional help necessary, and she does not own a car or have a driver's license, which makes transportation help necessary, but this is a long way from being incapacitated.  If every person who required some help of another was deemed incapacitated within the meaning of the tolling statute, the statute of limitations in Virginia would cease to exist.

Almost all aspects of the plaintiff's life point to her ability to manage her own affairs and those of her children without the benefit of a guardian or conservator.  Her mental health problems, her alcoholism, the Social Security Administration's requirement that she name a payee and the fact that she relies on her mother for assistance are simply not enough to rebut the defendant's evidence that the plaintiff has been perfectly capable of managing most of her own affairs since the date she was first injured in 1988.

Assuming for a moment that she was incapacitated within the meaning of the statute from the time she was adjudged disabled for the purpose of Social Security benefits in 1999, the statute of limitations would have run anyway.  Based on the plaintiff's Motion for Judgment, her answers to interrogatories, and the report of her own medical expert, her injury occurred, and the statute of limitations began to run, in 1988.  As this is eleven years before she was granted disability benefits, the statute of limitations would still bar her claim against the defendants.

**IV.    CONCLUSION**

The statute of limitations for personal injury actions is two years in Virginia.  The statute begins to run when an injury, however slight, occurs, not when it is discovered or diagnosed.  Based on the evidence provided by the plaintiff herself, the Court finds that the injury occurred, and the statute of limitations began to run, in 1988.  As this is more than two years before the plaintiff filed her complaint in 2004, the statute of limitations has run.  Moreover, in light of the plaintiff's ability to conduct her own affairs, to work, and to raise her children, this Court finds that she was not incapacitated and thereby prevented from filing suit within the applicable two-year limitations period.  The Court **GRANTS** defendants' motions for summary judgment under Rule 56(c) and **DISMISSES** this case with prejudice.

The Clerk is **DIRECTED** to send a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**

                                              /s/

                                             Robert G. Doumar
                                             UNITED STATES DISTRICT JUDGE

Norfolk, Virginia

April   13, 2006